(41 Misc. Rep. 580.)

## COLTON v. RAYMOND et al.

(Supreme Court, Special Term, New York County. November, 1903.)

1. ASSOCIATION—DISSOLUTION BY COURT—GROUNDS.

Under Laws 1894, p. 413, c. 235, § 5, providing that a joint-stock association shall not be dissolved except in accordance with its articles of association, or by the consent of its stockholders, or by judgment of a court for good cause shown, or for fraud in its management, the fraud required would be such as would defeat the rights of shareholders in violation of the agreement of the association, or where those in charge were converting the assets or profits of the corporation for their personal benefit.

2. SAME—FRAUD—EVIDENCE.

A charge that an association committed fraud in its management within Laws 1894, p. 413, c. 235, § 5, authorizing its dissolution and the appointment of a receiver, in that the management undervalued its merchandise in its annual inventories, *held* not supported by the evidence.

Action by Charles W. Colton against James I. Raymond and another, to dissolve a joint-stock association and for a receiver. Complaint dismissed.

Otis & Pressinger, for plaintiff.

Lockwood & Hill (William B. Hornblower, of counsel), for defendant Raymond.

GREENBAUM, J. A correct comprehension of the issues is necessary in order to give effect to the various portions of the mass of testimony submitted in this case. The complaint alleges that a co-

partnership in the business known as A. A. Vantine & Co. existed between plaintiff and defendant James I. Raymond on April 20, 1894, when the latter, with fraudulent intent to deprive the former of his alleged interest of $100,000 in said business, induced the plaintiff to organize a joint-stock association by a transfer to it of the copartnership assets; that as a part of the said alleged fraudulent scheme 625 shares of stock of the association, representing an alleged value of $275,000, were issued to the plaintiff upon his executing to said defendant Raymond a note of $175,000, subsequently reduced to $165,000, payable, with interest at 5 per cent., on a day certain, the payment of said note being secured by the deposit of the aforesaid 625 shares with Raymond, "who promised and agreed that if this was done said note should be paid from plaintiff's one-fourth of the profits of said association, which should be divided annually, and that said note should be renewed from time to time until paid out of said profits;" that thereafter large profits were made in the business carried on by said association, but the said Raymond, "in violation of his promise," and taking advantage of his ownership of substantially three-fourths of said stock, and of the control he exercised on the board of directors of said association, refused, after demand duly made, to declare any dividends from said profits, and "wrongfully prevented the plaintiff from receiving his share of said profits or from applying the same upon plaintiff's note, excepting that in the year 1895 one dividend of $15,000 was declared, notwithstanding the profits during the eight years which have elapsed since the organization of said association amounted to over $800,000"; that not only was plaintiff deprived of the benefits of dividends as aforesaid, but that, under threats that plaintiff's interest of 625 shares would be sold out, he was compelled on or about July 1, 1898, to give a note for $12,248.36 for alleged overdrafts; that said note was delivered "on the agreement that it should be paid from plaintiff's share of the profits, and that until so paid it was to be renewed from time to time." The complaint then alleges that on or about August 15, 1898, dissensions arose between the parties, and that thereupon the plaintiff and defendant Raymond agreed to dissolve their relations upon the agreement that plaintiff and his brother and father, who were then employed in said business, would all resign, and that he (plaintiff) would be paid "his one-fourth interest in the said business, less the amount owing by him upon his note as aforesaid"; that said resignations were duly effected, but that although the capital of said association was not only not impaired, but had largely increased by accrued profits on January 1, 1898, said Raymond refused to carry out said agreements or dissolve said association; that as a part of the aforesaid fraudulent schemes the said note of $12,248.36 was transferred to the defendant the Manhattan Company for the purpose of bringing a suit thereon and precluding plaintiff from interposing any defense thereto. The prayer of the complaint asks for a dissolution of the association, an accounting, the appointment of a receiver, and that the defendant Manhattan Company be decreed first to resort to certain collateral security in its possession for the payment of said notes, and that "any deficiency then resulting be paid by the asso-

ciation and be charged against plaintiff's interest." The answers deny the copartnership, the allegations of fraud, the various alleged agreements relative to extension of time and method of payment of said note and as to the annual division of profits and the payment of one-fourth interest upon the resignations set forth in the complaint. The answers further plead as a bar an adjudication in favor of the defendant Raymond in the United States Circuit Court in an action brought against him by plaintiff based upon a complaint containing allegations substantially like those set forth in this action, and in which plaintiff sought to recover a certain sum of money under the alleged agreement that said Raymond would pay plaintiff the value of one-fourth interest of the business of said A. A. Vantine & Co. The plea of res adjudicata was fully established upon the trial, so that, so far as all the allegations in the complaint which bore upon the alleged agreement of the transfer of a one-fourth interest in the association to plaintiff are concerned, they would seem to have no relation to the issues here presented, excepting possibly as they might throw light upon the questions hereafter to be considered. After plaintiff had presented a vast amount of testimony, he was permitted upon the trial to amend the complaint by adding the following allegation: "That A. A. Vantine & Company, the association, through its president, James I. Raymond, when he was in control of the association, committed fraud in its management by undervaluing its merchandise in his annual inventories, by paying excessive salaries to himself and his relatives, by appropriating the property of said association to his own use, and by falsifying its books—all with the intent to defraud plaintiff and to conceal the profits made by said association."

Stripping the complaint of all the immaterial allegations as to the circumstances leading to the formation of the association and the agreement to purchase a one-fourth interest, a fact which was determined adversely to plaintiff in the United States court, the only allegations remaining are, first, that the said Raymond refused to declare any dividends from the profits by reason of the advantage of his ownership of substantially three-fourths of the stock, for the purpose of preventing the plaintiff from receiving his share of the said profits and applying them on his note; second, that the association, through its president, "committed fraud in its management by undervaluing its merchandise in its annual inventories, by paying excessive salaries to himself and his relatives, by appropriating property of said association to his own use, and by falsifying its books—all with the intent to defraud the plaintiff and to conceal the profits made by the said association." It is evident that the plaintiff would not be entitled to a decree of dissolution by reason of the defendant Raymond's alleged violation of a personal promise or agreement to declare dividends from the profits for the purpose of applying them upon plaintiff's note. There is no allegation of any such agreement between the plaintiff and the association.

This brings us to the other grounds urged for a dissolution, and to a consideration of the characteristics that pertain to a joint-stock association, and the power of the court to decree its dissolution. It is not essential for the purposes of this case to indicate the origin

and history of joint-stock associations. It will suffice to refer to such cases as Van Aernam v. Bleistein, 102 N. Y. 355, 7 N. E. 537, People ex rel. Platt v. Wemple, 117 N. Y. 136, 22 N. E. 1046, 6 L. R. A. 303, and People ex rel. Winchester v. Coleman, 133 N. Y. 279, 31 N. E. 96, 16 L. R. A. 183, for an exposition of their growth and right to existence, and incidentally for an appreciation of the difficulty in definitely and concisely stating the essential differences between joint-stock associations on the one hand and corporations and copartnerships on the other. In People ex rel. Winchester v. Coleman, supra, it is stated:

"The full measure of corporate attributes has, by legislative enactment, been bestowed upon joint-stock associations, until the difference, if there be one, is obscure, elusive, and difficult to see and describe"—

And at page 287, 133 N. Y., page 98, 31 N. E., the opinion, after pointing out some of the distinguishing characteristics between corporations and joint-stock associations, concludes as follows:

"The two are alike, but not the same. More or less they crowd upon and overlap each other, but without losing their identity, and so, while we cannot say that the joint-stock company is a corporation, we can say, as we did say in Van Aernam v. Bleistein, 102 N. Y. 360 [7 N. E. 537] that a joint-stock company is a partnership with some of the powers of a corporation. Beyond that we do not think it is our duty to go."

But just how far these associations are to be considered partnerships for the purpose of determining the rights of shareholders in matters of management and dissolution has not been judicially passed upon, so far as I have been able to discover, unless Snyder v. Lindsey, 92 Hun, 432, 36 N. Y. Supp. 1037, affirmed as modified in 157 N. Y. 616, 52 N. E. 592, may be deemed an authority upon the right of a shareholder to bring an action for a dissolution of a joint-stock association. A study of that case reveals that, while the General Term treated the concern as a joint-stock association, it is by no means clear whether the Court of Appeals disposed of it solely upon the theory of a partnership or as a quasi association having all the features of a partnership. The provision of the statute affecting joint-stock associations which bears upon this subject is as follows:

"A joint-stock association shall not be dissolved except in pursuance of its articles of association, or by consent of all its stockholders, or by judgment of a court, for fraud in its management, or for good cause shown." Laws 1894, p. 413, c. 235, § 5.

It is thus evident that a judicial dissolution in this case may only be decreed either "for fraud in its management," or "for good cause shown." There seems to be no adjudication in this state construing the force or meaning of the quoted phrases. Snyder v. Lindsey, supra, throws no light upon this point, as in that case the assets of the concern had all been disposed of, and it was taken for granted that "good cause" was shown for a dissolution. It is reasonably clear that the two grounds are not identical, and that "a good cause shown" was not intended to include the case of "fraud in management." A "good cause shown" doubtless refers to a condition of affairs where the business of the association could no longer be carried on, either because of the inherent failure of the enterprise,

or because of considerable loss of the assets and consequent danger of continuing the business, or because of the existence of other reasons which threaten to eventually wipe out the assets or divert the business from the original purposes for which it was formed. It is, however, by no means clear what scope should be given to the phrase "fraud in management." It would obviously seem to refer to a case of fraud in the management which would tend to defeat the rights of the stockholders, in violation of and contrary to the spirit of the agreement of association, or result in a wrongful diversion or spoliation of the assets. Instances of such fraud of management would be where those in charge were converting to their own use either the profits or other assets of the business, or securing personal advantage or benefit in the management of the business at the expense of other stockholders. In the case at bar there appears to be no special reason for considering the effect of the phrase "for good cause shown," inasmuch as there is not only no allegation that the association of A. A. Vantine & Co. is insolvent, but, on the contrary, it is amply proved and repeatedly asserted that its business is prosperous, its capital largely increased, and that it is abundantly solvent, and there is no allegation that it is not conducting business in accordance with the purposes designed by the agreement of association and pursuant thereto. Moreover, the allegations in the complaint seem to be predicated upon the theory of a fraudulent management. The specific allegations of fraud are the undervaluing of the merchandise in the annual inventories, the payment of excessive salaries, the appropriation of property of the association to the use of the defendant Raymond, its president, and the falsification of the books of the association, "all with the intent to defraud the plaintiff and to conceal the profits made by the association." I will consider the charges of fraud seriatim: First, the undervaluing of merchandise in the annual inventories. It is evident that an undervaluation of merchandise in the annual inventories will not necessarily affect the real value of the assets of the concern. It may result in showing that the capital of the association is less than it really is, thereby diminishing the apparent value of the shares of the stockholders in the concern, and depriving them of the present benefits and advantages of a profitable business. It is, however, evident that, as it necessarily would affect all the stockholders alike, such undervaluation would not result in any discrimination in favor of or against any particular stockholder. It might, however, be claimed that a persistent and determined policy of undervaluation, conceived for the purpose of intentionally depreciating the shares, in order to force some of the members out of the concern or compel them to sacrifice their holdings, would operate as a fraud upon such members. It is under this view of the case, and assuming that the rights of a shareholder in a joint-stock association were more analogous to those of a partner than of a stockholder in a corporation, that I deemed it proper to permit the plaintiff to introduce a mass of testimony tending to show the relations of the parties and bearing upon the question of alleged undervaluation in the annual inventories. The rules of law applicable to cases of fraud must, however, be observed.

Fraud will not be presumed. It must be proven with reasonable certainty, and the question arises, has the plaintiff sustained the burden of proof in this respect? The learned counsel for the plaintiff, in order to establish the undervaluation of the merchandise and the consequent concealment of large profits, makes a computation of profits for 1901, based upon the wholesale and retail sales for that year. This is done by assuming that the proofs have established a certain large ratio of profits on wholesale sales, and a certain still larger ratio of profits on retail sales, from which the cost of the goods and the gross profits realized thereon are ascertained. The expenses for the year and certain other charges are deducted from the gross profits, and the net profits are thus claimed to be several hundred thousand dollars. The value of the test which the learned counsel here attempts to make may be well determined by applying it to the years during which the business of A. A. Vantine & Co. was under plaintiff's management. The testimony shows in a general way that the percentage of profits of the business during the incumbency of the plaintiff was about the same as in the year 1901. Referring, for example, to the inventory of 1894, it appears what the aggregate of the wholesale and retail sales for that year was, and what the expenses were. Taking the percentage of profits somewhat above that estimated by the plaintiff upon the sale of wholesale goods—a calculation most favorable to plaintiff—it would show an apparent net profit of several hundred thousand dollars. And yet we find, as matter of fact, profit and loss for that year credited with $18,176.11. Similar computations for successive years, when the plaintiff was in control, establish similar results. The inventory of 1897 credits profit and loss with $249,891.68, and yet a comparison of the business of that year with the one immediately preceding shows that the amount of purchases and sales and expenses were substantially the same for each of these years; and yet, in the one case, we find a credit to profit and loss of somewhat over $34,000, and for the following year, with a similar situation appearing in the books, we find the sum of upwards of $249,000 credited to profit and loss. An examination into the reason for this startling difference between these two years shows that in the inventory of 1897, when plaintiff was still in charge, the assets of the concern were placed at a much higher valuation than in the preceding year and the years previous thereto. Such items as the real estate in Japan, trademark and good-will, were valued at what I think may be regarded exorbitant figures. If, under the management of the plaintiff, the books show a comparatively small amount of net profit, it is not very surprising to find that the books during the past few years present the situation that they do. It is also evident that when the association was organized, in 1894, the capital was considerably overestimated. It may well be that under plaintiff's influence the association had adopted a method of valuation which the subsequent management so radically changed that there was a large apparent shrinkage in values, although all the assets were intact. Then, again, testimony of reputable merchants in similar lines of goods shows that the present method of taking stock is sanctioned by the practice in

vogue in their houses. It is also apparent that conservative and prudent management might justify the taking of the inventory at figures low enough to provide a margin of safety, to insure a more solid and substantial foundation for its future business. It is also evident that some of the goods of the firm are of such a character that, after the sale during a given season, the merchandise remaining would not have the same intrinsic value that they had at the beginning of the season, and that there are some lines of goods which might not be considered staple, and which would be affected by the changes of fashion. Indeed, a study of the inventories and figures of the various years is bewildering and confusing, and only tends to convince one of the absolute futility of determining the actual state of facts from mere bookkeeping methods or entries. Taking all these considerations together, I am by no means satisfied that the plaintiff has established a case of fraudulent undervaluation. My conclusion in this respect is the more strengthened by the fact that the plaintiff, in August, 1898, withdrew from the active management of the business, asserting the agreement between himself and the defendant Raymond that he (the plaintiff) was to be paid one-fourth interest in the business, less the amount owing by him upon his note. The attitude of the plaintiff, therefore, was that he had no interest in the association of any kind. The claims of fraudulent management are solely based upon acts done subsequent to August, 1898, and during the time when the suits brought by the plaintiff against the defendant Raymond for the purpose of recovering under the alleged agreement with him were pending.

The present action was brought after two successive trials and appeals, resulting in the defeat of plaintiff's claim in the federal courts, apparently, upon the theory that the defendant Raymond had violated his promise to declare dividends, which were to be applicable to the payment and ultimate discharge of plaintiff's note. As already shown, an alleged private agreement between the plaintiff and Raymond is unavailable as a ground for dissolution. It was only upon the trial of this action, and after the taking of considerable testimony, that the allegation of fraud in management was made. In view of all these circumstances, and from the actual proofs adduced, I do not think that the charge of fraudulent undervaluation is made in good faith, and I find that the charge has not been established in fact.

With respect to the allegations of fraud, as to excessive salaries, appropriation of property to the use of Raymond, and falsification of books, I do not find that the proofs warrant any finding in this behalf in favor of plaintiff. I am not prepared to say that, if an accounting were appropriate, some of the items to which exception is taken might not be successfully assailed; but, on the other hand, it is apparent that some of the acts of the defendant Raymond which were criticised may be explained by the fact that Raymond, owning an overwhelming interest in the business, acted in respect thereto as though he were the individual owner. I am not here required to pass upon any accounts. I am only called upon to consider the effect of such acts upon the issue of fraud presented. There may have been,

and doubtless were, errors of judgment and mistakes in fact.   Opinions, too, might differ as to the proper basis of valuing the merchandise upon the inventories, but from the proofs the court would not be justified in finding the defendants chargeable with fraud. It should also be borne in mind that even if it be assumed that large profits were made by the defendant association, it does not, therefore, necessarily follow that dividends must be declared.   It is needless here to cite authorities in support of the proposition that dividends need not be declared simply because profits have been earned.   It is the duty and province of the managers of a corporation, as well as of an association, to exercise their discretion in determining whether or not dividends should be declared, or whether it is wiser to accumulate a surplus for the legitimate uses of the business and to facilitate its future transactions.   Moreover, in this case it appears that the capital of the association was largely overestimated at the time of its formation, and it would be the duty of the association not to declare any dividends until after the full value of the capital stock of the association should equal the net worth of the business.

The complaint of the plaintiff must therefore be dismissed, with costs.   The conclusions which impel me to dismiss the complaint must also lead to an interlocutory judgment in favor of the defendant Raymond as prayed for upon his counterclaim.

Ordered accordingly.